11 CIV 4484

**WANCHOO LAW OFFICES, LLP**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone:   (646) 593-8866
Fax:       (646) 355-0244
E-mail: rwanchoo@wanchoolaw.com

RECEIVED

JUN 30 2011

U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RICH MARK DEVELOPMENT (GROUP) PTY. LTD.

                      Plaintiff,

          - against -

INDUSTRIAL CARRIERS INC.

                    Defendant.

------------------------------------------------------------X

11 CV ____ (___)

**VERIFIED COMPLAINT**

Plaintiff, RICH MARK DEVELOPMENT (GROUP) PTY. LTD. ("Plaintiff"), by its

attorneys, WANCHOO LAW OFFICES, LLP, alleges on information and belief as follows:

### JURISDICTION AND VENUE

1.      This is a case of admiralty and maritime jurisdiction within the meaning of Rule

9(h) of the Federal Rules of Civil Procedure, and within the admiralty and maritime jurisdiction

of the United States and of this Honorable Court. This case also falls under the Court's

admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2.      Alternatively, the Court has subject matter jurisdiction pursuant to 28 U.S.C.

§1332 because plaintiff and defendant are citizens of different states, or citizens of a state and a

foreign state, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

3.     At all material times, Plaintiff was and now is a foreign corporation organized under and existing by virtue of the laws of Australia, and is the disponent owner of the M.V. PACIFIC YUANGENG (the "Vessel"), a bulk carrier of about 174,505 deadweight tons capacity engaged in the carriage of bulk cargo by water.

4.     Upon information and belief, at all material times, Defendant, INDUSTRIAL CARRIERS INC. ("Defendant" or "ICI") was and now is a foreign corporation organized under and existing by virtue of the laws of a foreign country, and is registered to do business in the State of New York with the NYS Department of State, Division of Corporations, pursuant to N.Y. B.C.L. §§1300, *et. seq.*, with a registered agent located in the Southern District of New York in care of CT Corporation System, 111 Eighth Avenue, New York, NY 10011, and was at all material times the charterer of the Vessel. A true and accurate printout of Defendant's proof of New York registration is annexed hereto as **Exhibit 1**.

## FACTS GIVING RISE TO CLAIM

5.     On or about May 9, 2008, a time charter party (the "Charter") was made between Plaintiff, as disponent owner of the Vessel, and ICI as Charterer whereby ICI chartered the Vessel for the carriage of bulk cargo for a period of 11 to 13 months +/- 15 days in Charterer's option. A true and accurate copy of the charter party is annexed hereto as **Exhibit 2**.

6.     The Charter provided that ICI shall pay for the use and hire of the Vessel at the rate of $133,000.00 per day payable every 15 days in advance.

7.     Plaintiff delivered the Vessel to ICI on June 1, 2008. The ninth hire payment was due on September 30, 2008 and the tenth hire payment was due on October 13, 2008. Despite various reminders, ICI neglected to pay both hire payments in breach of its obligations under the Charter.

8.      Accordingly on October 15, 2008, pursuant to Clause 37 of the Charter, Plaintiff gave ICI notice of three clear banking days to rectify its failure to pay hire, failing which Plaintiff would withdraw the Vessel. On the same date, Plaintiff also served a notice of lien on Taiwan Maritime Transport Co. Ltd. ("TMT"), who had chartered the Vessel from ICI for all sums payable by TMT to ICI under the sub-charter party.

9.      As ICI failed to rectify its failure to pay the ninth and tenth hire, Plaintiff withdrew the Vessel on October 31, 2008 from the service of the Defendant. The earliest date that ICI could have redelivered the Vessel to Plaintiff under the Charter was on or about May 1, 2009. Hence, as a result of Defendant's repudiation of the Charter the Charter was terminated 181 days early (balance of the charter period from October 31, 2008 to May 1, 2009).

10.     By October 31, 2008 the average daily time charter hire rate for Capesize vessels (vessels of similar size to the instant Vessel) had fallen to $5,982 per day. A true and accurate copy of the Baltic Exchange Capesize Index published by the Baltic Exchange Information Services Ltd. is annexed hereto as **Exhibit 3**.

11.     The proper measure of damages for Defendant's breach of the Charter is the difference between the original charter rate and the prevailing market rate for equivalent business at the time of the breach. *Orion Shipping & Trading v. Eastern States Petroleum Corp.*, 312 F.2d 299 (2d Cir.), cert. denied 373 U.S. 949 (1963).

12.     By reasons of the premises, Plaintiff has sustained damages in the amount of $22,990,258 ($133,000-$5,982 = $127,018 x 181 days).

13.     Under the terms of the Charter any dispute arising between the parties shall be referred to arbitration in Singapore. On or about January 21, 2009 Plaintiff, pursuant to clause 61 of the Charter, commenced arbitration against ICI by filing a notice of arbitration with the

3

Singapore International Arbitration Centre ("SIAC").  On or about February 3, 2009 the arbitration proceedings before SIAC were suspended to enable Plaintiff inter alia to consider an appropriate forum for the economic resolution of the disputes.

14.     On or about June 22, 2011, Plaintiff gave ICI notice to agree to the transfer of arbitration proceedings from Singapore to New York and to the appointment of a sole arbitrator for an efficient, fair and cost effective resolution of the dispute. However, despite repeated requests Defendant has failed to respond to Plaintiff's arbitration demand.

15.     All and singular the premises are true and within the admiralty and maritime jurisdiction of this Honorable Court.

**WHEREFORE,** the Plaintiff prays the following:

1.     That process in due form of law according to the practice of this Court in causes of admiralty and maritime jurisdiction may issue against Defendant, Industrial Carriers Inc., that it be personally cited to appear and answer the matters set forth above;

2.     That judgment be entered in favor of Plaintiff and against Defendant in the amount of US$22,990,258.00 with interest and costs; and

3.     That this Court grant to Plaintiff such other and further relief as may be just and proper in the circumstances.

Dated: New York, New York
       June 30, 2011

                              **WANCHOO LAW OFFICES, LLP**
                              *Attorneys for Plaintiff*
                              RICH MARK DEVELOPMENT (GROUP)
                              PTY. LTD.


                              By: ___Rahul  Wanchoo___
                                  Rahul Wanchoo (RW-8725)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

RICH MARK DEVELOPMENT (GROUP) PTY. LTD.

                    Plaintiff,

                                                    11 CV _____ ( __ )
            - against -
                                                    **VERIFICATION**

INDUSTRIAL CARRIERS INC.

                    Defendant.

-------------------------------------------------------X


_Liu Yiskuai_........, hereby declare pursuant to 28 U.S.C. Section 1746:

1. I am the ........_chartering manager_.. of RICH MARK DEVELOPMENT (GROUP) PTY. LTD.; that I
   am authorized by said company to make this verification in its behalf; and that I have
   read the foregoing Verified Complaint and know the contents thereof and the same are
   true to the best of my knowledge, information and belief.

2. I declare under penalties of perjury under the laws of the United States of America that
   the foregoing is true and correct.


                                    By: _____


Executed on June **30**, 2011

# EXHIBIT 1

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through June 28, 2011.

---

Selected Entity Name: INDUSTRIAL CARRIERS INC
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | INDUSTRIAL CARRIERS INC |
| **Initial DOS Filing Date:** | NOVEMBER 16, 2005 |
| **County:** | NEW YORK |
| **Jurisdiction:** | MARSHALL ISLANDS |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Registered Agent**

CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| NOV 16, 2005 | Actual | INDUSTRIAL CARRIERS INC |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

# EXHIBIT 2

# Time Charter
## GOVERNMENT FORM
### Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1 THIS CHARTER PARTY, made and concluded in *BEIJING*          *09th*                    day of   *MAY*        *2008*   ~~19~~
2 Between *Rich Mark Development (Group) Pty. Ltd*
3 disponent Owners of the good        *Panama Flag*      ~~Steamship~~/Motorship        MV "Pacific Yuangeng" (See Clause 29)          of
4 of                    ~~tons gross register, and~~            ~~tons net register, having engines of~~            indicated horse-power
5 ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~
6 at              ~~of about~~              ~~cubic feet bale capacity, and about~~              tons of 2240 lbs.
7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~
8 ~~allowing a minimum of fifty tons) on a draft of~~        ~~feet~~        ~~inches on~~          ~~Summer freeboard, inclusive of permanent bunkers,~~
9 ~~which are of the capacity of about~~                    ~~tons of fuel, and capable of steaming, fully laden, under good weather~~
10 ~~conditions about~~              ~~knots on a consumption of about~~              ~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~
   now    *trading*
        and    **INDUSTRIAL CARRIERS INC.**

Charterers of the City of     *MAJURO/MARSHALL ISLANDS*

13      Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about   *period about 11 months / 13 months (about means +/15 days more or less Charterer's option*      within below mentioned trading limits.
15 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16 the fulfillment of this Charter Party.
17 Vessel to be placed at the disposal of the Charterers, at      *on dropping last outward sea pilot one safe port LIANYUNGANG/RIZHAO/LANSHAN*
   *CHINA*                *IN*                    *CHARTERER'S*                        *OPTION*

18 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as~~
19 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5.~~ Vessel on her delivery *or*
   *Owners' option arrival first load port* to be
20 ready to receive cargo with clean-swept holds *(see Clause 30)* and tight, staunch, strong and in every way fitted for the service, having
   water ballast, ~~winches and~~
21 ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and~~
   ~~the same~~
22 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful *harmless*
   *merchan-*
   dise, ~~including petroleum or its products, in proper containers, excluding~~
   ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk;~~
25 ~~all necessary fittings and other requirements to be for account of Charterers); in such lawful trades, between safe port and/or ports in British North~~
26 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
27 ~~Mexico, and/or South America~~                                              ~~and/or Europe~~
28 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
29 ~~October 31st and May 15th, Hudson Bay and all unsafe ports ; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
30
31
32 *See Clause 34*
33 as the Charterers or their Agents shall direct, on the following conditions :
34      1. That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew ;
   shall pay for the
35 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *lubricating oil, garbage removal except*
   *compulsory garbage removal to be for Charterer account* boiler water and maintain her class and keep
36 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.
37      2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary and*
   *compulsory* Pilotages *(including Torres Strait/Barrier Reef Pilots, Japan Inland Sea Pilots, Bosphorus and Dardanelles*
   *Pilots, Magellan Pilots, Skaw/Great Belt/The Sound Pilots),* Agencies, custom clearance, *botage on Charterers'*
   *business, towage/tug, canal and light dues,* Commissions
38 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
39 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

40 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

41 charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

42 ~~of six months or more.~~

43 ~~Charterers are to provide necessary dunnage and shifting boards; also any extra fittings requisite for a special trade or unusual cargo, but~~

44 ~~Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards~~

45 ~~for dunnage, they making good any damage thereto.~~

46 ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

47 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ tons and not more than

48 ~~tons and to be re-delivered with not less than~~ tons and not more than tons.

49 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of    *See Clause 36*

United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

50 ~~stores, on~~ summer freeboard, per Calendar Month, commencing on and from the day/ *time* of her delivery, as aforesaid, and at

51 and after the same rate for any part of a *day* ~~month~~ ; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

52 wear and tear excepted, to the Owners (unless lost)  ~~at~~      *See Clause 30*

53

54

55

58

59 unless otherwise mutually agreed, Charterers are to give Owners not less than   *See Clause 30*      days

60 notice of vessels expected date of re-delivery, and probable port.

61 5. Payment of said hire to be made  *as per Clause 37* in ~~New York~~ in ~~cash in United States Currency, semi-monthly in advance; and for the last half month or~~

62 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

63 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

64 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

65 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers.  *See Clause 37* ~~Time to count from 7 a.m. on the working day~~

66 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

67 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

68 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain,  *and approved by the Owners.* ~~by the~~

69 ~~Charterers or their Agents, subject~~ to 5 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

70 of such advances.

71 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

73 ~~lie aground.~~

74 7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

75 accommodations for Supercargo  *(if applicable),* if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's Officers, crew

76 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

77 ~~paying Owners~~ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

78 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~  *No Passengers are allowed.*

79 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

80 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

81 agency ; and Charterers are to load, stow, ~~and~~ trim  *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

82 cargo as presented, in *strict* conformity with Mate's  ~~or Tally Clerk'~~ receipts *without prejudice to this Charter Party.*

83 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

84 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

85 10. That the Charterers shall have permission to appoint a Supercargo, who shall *subject to availability of life-boat capacity and signing letter of indemnity In Owners' P and I Club wordings*, accompany the *under his own risk* and see that voyages are prosecuted

86 with the utmost despatch. He is to be furnished with free accommodation, *if availabe,* and same fare as provided for Captain's table, Charterers paying at the

87 rate of *US$10.00* ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual

Tally

88  Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~      *See Clause 55*

89      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *in English* and the

90  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
91  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
92  sumption of fuel.

93      12. That the Captain shall use diligence in caring for the ventilation of the cargo.

94      13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~
95

96  ~~on giving written notice thereof to the Owners or their Agents          days previous to the expiration of the first-named term, or any declared option.~~

97      14. That if required by Charterers, time not to commence before      *25TH MAY 2008*                        and should vessel
98  not have given written notice of *delivery by telex/fax/email*      readiness on or before      *15TH JUNE 2008*      but not later than 4 p.m. Charterers or

99  ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~      *Laycan to be narrowed into 10 days spread*

100      15. That in the event of the loss of time from deficiency *and/or default* of men or stores, fire, breakdown or damages to hull, machinery or equipment *unless such damage caused by Charterers and/or their servants.*

grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other *similar* cause preventing the full working of the vessel, the payment of hire shall cease for the *actual* time thereby lost ; and if upon the voyage the speed be reduced by

103  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
104  thereof, and all *proven direct* extra expenses shall be deducted from the hire.

105      16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
106  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
107  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

108      The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

110      17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
111  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen ; their decision or that of any two of them, shall be final, and for~~
112  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~      *See Clause 61*

113      18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and all sub-hires*, for any amounts due under this Charter, including General Aver-

114  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
115  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
116  might have priority over the title and interest of the Owners in the vessel.

117      19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
118  Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
York-Antwerp Rules *1994 or any subsequent modification thereof see Clause 70*, ~~1924, at such port or place in the United States as may~~
~~be selected by the carrier, and as to matters not provided for by these~~

120  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
121  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
122  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
123  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
124  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
125  ~~required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
126  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
127  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
128  ~~United States money.~~      *Hire not to contribute to General Average.*

129      ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
130  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
131  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
132  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
133  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
134  ~~ships belonged to strangers.~~

135      ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

136      20. ~~Fuel used by the vessel while off hire; also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity; and the~~
137  ~~cost of replacing same, to be allowed by Owners.~~

138      21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

139 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months; reckoning from~~
140 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
141 *See Clause 53*

142

143     22. Owners shall maintain the gear of the ship as fitted, ~~providing gear (for all derricks) capable of handling lifts up to three tons, also~~
144 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
145 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *Sufficient lights as on*
    *board lanterns and oil for*
146 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
147 Charterers to have the use of any gear on board the vessel.

148     .   23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging ;~~
149 ~~steamer to provide one winchman per hatch to work winches day and night, as required; Charterers agreeing to pay officers, engineers, winchmen,~~
150 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
151 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
152 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay and loss of time occasioned~~
153 ~~thereby.~~

154     ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions form liability contained~~
155 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessel ;~~
6 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
~~of which are to be included in all bills of lading issued hereunder :~~

158     ~~U. S. A. Clause Paramount~~
159     ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
160 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
161 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
162 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

163     ~~Both-to-Blame Collision Clause~~
164     ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
165 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried~~
166 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss~~
167 ~~or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-~~
168 ~~carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
169 ~~Owners as part of their claim against the carrying ship or carrier.~~

170     25. The vessel shall not be required to *force ice or to follow ice-breakers or to* enter any ice-bound port, or any port where lights
or light-ships have been or are about to be with-
171 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
172 port or to get our after having completed loading or discharging.    *See Clause 75*

173     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The *Owners to remain responsible for the*
navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

    27. A Commission of ~~2 1/2~~ 1.25 per cent is payable by the Vessel and Owners to *WHICH IS EVENLY SHARED BY ASSOCIATIATED*
*SHIPBROKING AND UNI-WAY INTERNATIONAL SHIPPING CO.* ~~which shall be deducted from all hires.~~
176 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

177     28. An address commission of *3.75* ~~3 1/2~~ per cent payable to. *CHARTERERS*      on the hire earned and paid under this Charter.

    *Additional Clause 29 to 81, both inclusive, as attacked are fully incorporated in this Charter Party.*


    Charterers:                                Owners:


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

## CLAUSE 29 - VESSEL DESCRIPTION

- M.V. MV PACIFIC YUANGENG

-EX ZORBAS

-PANAMA FLAG / BLT 1996

-BULKCARRIER / CLASS NK

-ABT 174,505 MT DWAT ON ABT 18.625M SSW DRAFT

-LOA 281.83M / BREADTH (MOULDED)   44.90M

-9 HO/HA - HA SIZES (1+9) 15.30 X 19.80M (OTHERS) 16.20 X 19.80M

-GRAIN 6,480,357CUFT

-AUSSIE HOLD LADDERS FITTED

-SPEED / CONSUMPTION:
 BALLAST: ABT 14.2 KTS ON ABT 48.0 MT IFO 380CST
 (ISO 8217/96-RMG35 AND MINIMUM 40MJ/KG)
 LADEN: ABT 12.40 KTS ON ABT 51.0 MT IFO 380CST
 (ISO 8217/96-RMG35 AND MINIMUM 40MJ/KG)
 PLUS ABT 1.7 MT MGO (ISO 8217/95 DMB) AT SEA EXCEPT IN CASE OF EMERGENCY,
 AND/OR MANOEUVRING, AND/OR SAILING WITH REDUCED RPM, AND/OR
 BALLASTING-DEBALLASTING, AND/OR HOLDS WASHING, AND/OR CHANGING OF
 BALLAST WATER, AND/OR WHEN SHAFT GENERATOR HAS TO BE DISCONNECTED OR
 REDUCED DUE TO BAD WEATHER, AND/OR NAVIGATING IN RESTRICTED AREAS LIKE
 APPROACHES, CANALS, RIVERS, SHALLOW WATERS ETC., IN WHICH CASE MGO
 CONSUMPTION ON DIESEL GENERATORS IS ABT 3.5MT DAILY
 ABOVE SPEED/CONSUMPTION ALWAYS BASIS GOOD WEATHER UPTO BEAUFORT WIND
 FORCE 4, AND/OR DOUGLAS SEA STATE 3, AND NOT AGAINST ADVERSE CURRENT AND
 NO NEGATIVE INFLUENCE OF SWELL.

-NO MIXING OF BUNKERS FROM DIFFERENT ORIGIN

-FOR SAFETY REASONS, CHARTERERS TO PROVIDE/KEEP ON BOARD DURING SEA
 PASSAGES  SUFFICIENT  USABLE  QUANTITY  OF  MGO  FOR  OPERATING
 AUXILIARIES/GENERATORS ON THE WHOLE PASSAGE ON THE BASIS OF DAILY
 CONSUMPTION OF ABT 3.5MTS MGO (ISO 8217/96 DMB).

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

-PORT CONSUMPTION:
ABT 4.5 MT MGO (ISO 8217/96 DMB) PER DAY IDLE PLUS
ABT 6.5 MT MGO (ISO 8217/96 DMB) PER DAY BALLASTING/DEBALLASTING OPERATION.

-NO MIXING OF BUNKERS OF DIFFERENT ORIGIN

ALL DETAILS ABOUT

- *OWRS GURANTEE THAT THE VSL IS RIGHTSHIP-APPROVED AND TRADEABLE INTO BRAZIL/SOUTH AFRICA/AUSTRAILIA.*

*Vessel's full itinerary: ETA Qingdao AM/16th/May        ETB Qingdao: 23rd/May*
*ETCD Qingdao: 25th/May       ETA Lianyungang: 25th/May*
*ETB Lianyungang: 26th/May   ETCD Lianyungang: 28th/May 2008*
*If all goes well, without guarantee*

## CLAUSE 30 - DELIVERY AND REDELIVERY

Vessel to be delivered on dropping last outward sea pilot one safe port *Lianyungang or Rizhao or Lanshan China, in Charterers' option,* at any time day or night, Sunday and Holidays included.

Owners to give Charterers10/ 7 / 5 / 3 / 2 / 1 day notices of delivery.

Vessel's holds on delivery or at Owners' option on arrival at first load port to be clean so as to pass hold inspection and ready to receive Charterers intended cargo, failing which vessel is to be placed off-hire from time of rejection until vessel passed re-inspection. All cleaning expenses to be for Owners account. Owners to arrange to clean the vessel's holds immediately upon rejection and with the utmost dispatch.

*Vessel to be redelivered on dropping last outward sea pilot one safe port Singapore/Japan range including Malaysia / Indonesia / Thailand / Taiwan / People's Republic of China/ South Korea port in Charterers' option at any time day or night, Sundays and holidays included or Charterers' option dropping last outward sea pilot one safe port Skaw/Passero range including UK / EIRE port in Charterers' option at any time day or night, Sundays and holidays included or Charterers' option passing Skaw/Passero westbound at any time day night, Sundays and holidays included.*

Laycan to be based on local time. For the purpose of computing hire payments, time of delivery / redelivery to be adjusted to G.M.T.

Charterers to give Owners 45/30/20/15/7 days approximate and 5/3/2/1 days definite

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

notice of redelivery and port (or ports within a specified·range), immediately advising Owners of any change in intended redelivery port. Charterers also to keep Owners updated of vessel's schedule and notify Owners immediately of any unforeseen delay.

## CLAUSE 31 - ON AND OFF-HIRE SURVEY

On and off-hire survey (bunker and condition survey) shall be held at the port of delivery jointly between Charterers and Owners by one single surveyor to be mutually agreed. On-hire surveyor to be appointed by Charterers with Owners' prior approval and off-hire surveyor to be appointed by Owners with Charterers' prior approval. On-hire survey to be held at port of delivery in Charterers' time and off-hire survey to be held in Owners' time at last discharge port before redelivery. Expenses for on/off-hire survey to be equally shared between Owners and Charterers; The Charterers are to provide the Master/Owners with a copy of the on-hire report as soon as same has been issued.

## CLAUSE 32 - CARGO

*Charterers are only permitted to load coal and iron ore in bulk, including iron ore pellets / iron ore lumps in bulk, always excluding DRI / DRIP. Cargoes never to be injurious to vessel and/or crew and/or stevedores. Cargo always to be loaded, stowed and discharged in accordance with IMO regulations.*

Vessel to be always left in a seaworthy trim to the Master's satisfaction during her sailing and/or shifting between all berths and ports.

## CLAUSE 33 - INTERMEDIATE HOLD CLEANING

*USD 700 / hold each time, provided local regulations/weather/safety/time permit, crew to perform intermediate hold cleaning in Charterers' time. The crew will endeavour to do such cleaning with available equipment on board, but without guarantee that the cargo holds will be accepted at the subsequent loadport(s). In case holds are not passed, Vessel/Master/crew/Owners/Manager shall not be responsible for any consequences arising therefrom and Vessel to remain on-hire throughout. Fresh water, chemicals, materials and or equipment, if required for cleaning holds, to be for Charterers' account.*

## CLAUSE 34 - TRADING EXCLUSIONS

Trading worldwide between safe port(s), safe berth(s), safe anchorage(s), always safely afloat, always accessible, always within Institute Warranty Limits, excluding trading to ice bound areas, Cuba, Haiti, Israel (or Israel controlled countries/areas), Iran, Iraq, Persian Gulf, Libya, Liberia, Lebanon, Cyprus, Syria, Albania, Algeria, Former Yugoslavia states, Angola, Cameroon, Gabon, Equatorial Guinea, Democratic Republic of Congo (Formerly Zaire), Eritrea, Somalia, Cabinda, Federal Republic of Serbia and Montenegro including Rosovo, Nigeria, Malabo, Ivory Coast, Namibia, Ethiopia, Yemen, Sierra Leone, Great Lakes, St. Lawrence River, Amazon River,

## RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
## CHARTER PARTY DATED 09TH MAY, 2008

Orinoco River, Sri Lanka, Cambodia, Laos, Vietnam, Myanmar, North Korea, CIS/Russian Pacific ports and war or war-like zones as well as those countries / places from time to time prohibited by Owners' war risk underwriters / brokers and /or excluded by the vessel's flag state authorities / registry or Owners' domicile, and/or where U.N. / U.S.A sanctions and / or restrictions are in force. Orders of Owners war risk underwriters / brokers are always to be followed.

Vessel not to be ordered to/from Taiwan directly after or prior calling PRC. In any event vessel not to force ice or follow ice breakers.

## CLAUSE 35 - BUNKER CLAUSE

*Bunkers on delivery as on board, but always sufficient to reach nearest main bunkering port. Bunkers on redelivery to be about same as delivery.*

Bunker price USD 610 per metric ton for IFO and USD 1150 per metric ton for MGO respectively. Same price to apply both ends.

Owners privilege to bunker for their own account prior to redelivery provided same does not interfere with loading/discharging operations.

*Charterers privilege to bunker for their own account prior to delivery provided same does not interfere with owners operation.*

The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) as set out in Clause 29.

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the specification(s) or otherwise prove unsuitable for burning in the vessel's engines and/or auxiliaries, the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

## CLAUSE 36 - CHARTER HIRE

*Hire rate : USD 133,000(One hundred Thirty-three thousand dollars)* daily including overtime pro rata.

## CLAUSE 37 - HIRE PAYMENT

a.Payment

*Hire payable 15 days in advance by T/T in full without any bank charges in USD to Owners' nominated bank account. Charterers to pay the first hire and value of bunker*

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

*on delivery within 3 (three) banking days after vessel's delivery.*

Payment of hire shall be made so as to be received by Owners or their nominated payee on the due date, in advance.

Charterers shall have the liberty to deduct from charter hire during the period of this charter any undisputed off-hire time and/or actual Owners disbursements if specially requested to do so by Owners. Charterers are not allowed to deduct any estimated amounts from hire without Owners' prior approval, however, Charterers are allowed to deduct estimated bunker on redelivery values from the last sufficient hire payment at any case.

Failing the punctual and regular payment of hire, or any breach whatsoever of this Charter Party, the Owners shall be at the liberty to withdraw the vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

b.Grace Period

Where there is any failure to make punctual and regular payment of hire, the Charterers shall be given by the Owners 3 (three) clear banking days written notice to rectify the failure, and when so rectified within those 3 (three) days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay the hire within 3 (three) days of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as above.

c. Last Hire payment

Should the vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate payment of hire is/are due, said payment is/are to   be made for such length of time as the Owners and the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking into account bunkers actually on board, and disbursements for the Owners' account if actually incurred before redelivery. Should same not cover the actual time, hire is to be paid for the balance, day by day, as it becomes due, if so required by Owners. When the vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be.

d. Final accounting to be settled between Charterers and Owners within 14 days after the redelivery of the vessel.

## CLAUSE 38 - IN LIEU OF HOLD CLEANING

Charterers shall pay the Owners *USD 7,000 lumpsum in* lieu of hold cleaning on redelivery.

## CLAUSE 39 - BIMCO CANCELLING CLAUSE 2002(CODE NAME :

Rider Clause to M/V "Pacific Yuangeng"
Charter Party Dated 09th May, 2008

## CANCELCON 2002)

(a) Should the Vessel not be ready to load (whether in berth or not) on the agreed cancelling date, the Charterers shall have the option of cancelling this Charter Party.

(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.

Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.

## CLAUSE 40 - QUARANTINE

Normal quarantine time and expenses for the vessel entering port shall be for Charterers' account. Any additional time or detention and/or expenses for quarantine due to pestilence and illness of Master, officers and crew shall be for Owners' account, but if quarantine detention and/or expenses is due to the vessel having been to the port(s) sent by Charterers whilst under this charter, such detention time and expenses shall be for Charterers' account.

## CLAUSE 41 - CARGO CLAIMS

Cargo claims as between the Owners and the Charterers, if any,  shall be settled in accordance with the Inter-Club New York Produce Exchange agreement of September 1996, and its amendments thereto.

The party handling the claim shall submit to the other party supporting documents as soon as possible.

## CLAUSE 42 - STEVEDORE DAMAGE

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence.  The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness / Class or the proper working of the Vessel and/or her equipment, to be repaired to the satisfaction of Class surveyor,

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

immediately at the port of occurrence prior to sailing, in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst Vessel is in drydock, provided this does not interfere with the Owners' repair work, or by Vessel's crew at the Owners' convenience. All costs of such repairs shall be for the Charterers' account. Any time spent in repairing stevedore damage shall be for the Charterers' account.

Charterers shall have the option to redeliver the vessel without repairing the stevedore damages for which Charterers are responsible incurred during the currency of this charter as long as the damages do not affect seaworthiness / Class or the proper working of the Vessel and/or her equipment, but Charterers undertake to pay for the repairs immediately against production of repair bills by the dockyard / repairers unless otherwise agreed.

The Charterers shall pay the Owners for stevedore damage whether or not payment has been made by stevedores to the Charterers.

## CLAUSE 43 - OCEAN ROUTE

In order to maximize vessel's performance, Charterers shall have the option to employ an independent weather routing company OCEANROUTE / APPLIED WEATHER to advise Master on routing during the voyage specified by Charterers. Master shall adhere to the suggestions concerning routing, but Master, for the safe navigation, shall at his discretion, deviate from the suggested route, in which case he is to detail in log book the reasons for departing from them. In the event of consistent discrepancy between vessel's logs and Ocean Route / APPLIED WEATHER, Owners and Charterers agree to settle by amicable negotiation, failing which if any dispute amount in excess of USD 100,000 may be referred to a mutually acceptable shipping professional or Arbitration whose decision or award shall be final.

Charterers to provide supporting documents to substantiate their speed claims if any and same to be dealt with separately and not to be deducted from hire unless with Owners' prior consent. In the event of any speed claims, fuel savings, if any, due to reduced speed is to be considered and set off as credits against such claims.

When indicting a speed of "about" this gives the vessel the allowance of half knot and when indicating a consumption of "about" this gives the vessel the allowance of half metric ton.

The Charterers waive their right to claim on vessel's performance affected by the fouling of vessel's bottom arising from the prolonged stay exceeding 18 (eighteen) consecutive days in port for Charterers' business. However, Owners on Charterers' request, will endeavour to take action to rectify vessel's performance when there is possibility to arrange at a suitable/convenient place for hull bottom cleaning at Charterers' time and cost.

## CLAUSE 44 - BILLS OF LADING

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

The Master shall sign Bills of Lading for cargo as presented in strict conformity with
mate's receipts. If required, Owners / Master shall authorize the Charterers or their
agents to sign Bills of Lading on behalf of the Master, always strictly in accordance with
mate's receipts. Congen Bills of Lading to be issued.

All Bills of Lading shall be without prejudice to this Charter Party and the Charterers
shall indemnify the Owners against all consequences or liabilities which may arise from
any inconsistency between this Charter Party and any bills of lading signed by the
Charterers or their agents or by the Master at Charterers' request. NO Liner terms or
Through Bills of Lading or Sea Waybills to be issued.

In case original Bills of Lading are not available at discharge port upon vessel's arrival,
Owners at the request of Charterers, shall agree to discharge the cargoes into customs'
custody without presentation of original Bills of Lading, provided that prior to discharge
of cargo, Charterers have submitted to Owners an original Letter of Indemnity (LOI) as
per Owners PNI wordings.   The LOI to be issued on Charterers company letter-head,
signed by Charterers authorized signatory and stamped with company stamp.

## CLAUSE 45 - CHARTERERS' AGENT

Charterers agree that their agents will attend to vessel/Owners' matters (such as
normal husbanding) as Owners agents without agency fees / additional charges to
Owners, but in such case actual expenses incurred to be for Owners' account.

Charterers can deduct such actual expenses including cash advance to Master from
subsequent hire payments provided that such expenses are requested and authorized
by the Owners. Charterers shall provide Owners with the original vouchers/invoices
covering Owners' expenses latest within 120 days after vessel's departure from the
port(s).

## CLAUSE 46 - PUT BACK CLAUSE

Should the Vessel deviate or put back during a voyage, contrary to the orders or
directions of the Charterers, for any reason other than accident to the cargo which
causes hire to be suspended under this Charter Party, hire shall cease to be payable
from the actual time of such deviation until the time when the vessel is again ready to
resume her service from a position not less favourable to the Charterers that that at
which the deviation commenced, provided always that due allowance shall be given for
any distance made good towards the vessel's destination and any bunkers saved. All
bunkers used by the vessel while actually off hire shall be for the Owners' account.
However, should the Vessel be driven into port or to anchorage by stress of weather,
trading to shallow harbours or to rivers or ports with bars, any detention of the vessel
and/or expenses resulting from such detention shall be for the Charterers' account, or
by any cause for which the Charterers are responsible under this Charter Party the
vessel shall remain on hire and all costs thereby incurred shall be for the Charterers'
account.

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

## CLAUSE 47 - DEVIATION

Vessel shall have the liberty to deviate for the purpose of saving life and/or property and to tow and assist vessels in distress, such operation shall not be deemed to be a deviation under this Charter Party, but all salvage attribution thus payable to the vessel shall be equally divided between Charterers and Owners after proper deduction of expenses, if any (including Master's, Officers', crew's share) incurred in this respect.

## CLAUSE 48 - CAPTURE, SEIZURE, DETENTION, ARREST

Should the vessel be captured or seized or detained or arrested during the currency of this Charter Party by any authority or at the suit of any person having or purporting to have a claim against or any interest in the vessel, the payment of hire shall cease from the time of her capture or seizure or detention or arrest  (unless the vessel is still available for use by the Charterers) until the time of her release, unless such capture or seizure or detention or arrest is occasioned by any act, omission and/or default of the Charterers and/or their agents, servants, sub-contractors, or Shippers/Receivers or by reason of the cargo so carried.

## CLAUSE 49 - SMUGGLING

Any actual delay, expenses and/or fines incurred on account of smuggling shall be for Owners' account if caused by the officers and/or crew, or shall be for Charterers' account if caused by the Charterers and/or their staff and/or agents, stevedores, sub-contractors etc,.

## CLAUSE 50 - WATCHMAN

Watchmen shall be for Owners' account unless compulsorily required by port regulation or by Charterers and/or their agents for cargo in such case to be for Charterers' account.

## CLAUSE 51 - WAR ZONE

The vessel, unless the consent of the Owners be first obtained, not to be ordered nor continue to any place or on any voyage, nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, war like operations, act of piracy or hostility. Owners shall notify Charterers promptly if any port to which Charterers have given notice the vessel is to be ordered is or has become in the opinion of the Owners underwriters brokers, a war zone.

## CLAUSE 52 - WAR CANCELLATION

In the event of outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., The People's Republic of China, Japan, South Korea, Germany, Australia, or the nation

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

under the flag of which the vessel is registered, which seriously and directly affects Charterers or Owners ability to perform their obligations under this Charter Party, either Charterers or Owners may have the option of cancelling this Charter whereupon the Charterers shall redeliver the vessel to the Owners provided no cargo remaining on board. If vessel has cargo on board after discharge thereof at destination or, if debarred from reaching or entering it at a near open and safe port as directed by the Charterers. Refer ConWartime 2004. In all cases hire shall be paid until the vessel's redelivery.

## CLAUSE 53 - DRY DOCKING

Owners have the option to dry dock the vessel during this charter period by giving Charterers 60 days notice of their intention which Charterers will program the vessel to Far East to facilitate Owners' drydocking, keeping Owners closely advised of vessel's schedule. Except in case of emergency, which to be mutually agreed between Owners and Charterers.

## CLAUSE 54 - Charterers' PNI

Charterers PNI Club: UK

## CLAUSE 55 - CABLE/ENTERTAINMENT/VICTUALLING

*Charterers shall pay the Owners a lumpsum of USD 1,500 per month.*

## CLAUSE 56 - TAXES

Charterers to pay all taxes and/or dues assessed on the vessel resulting from the Charterers' orders herein, including any taxes and/or dues on tonnage / cargo and/or freights and/or sub-freights and/or hires and/or sub-hires, excluding taxes on hire levied in the country of the vessel's flag or her Owners' domicile.

## CLAUSE 57 - FUMIGATION

Charterers shall have the right to fumigate holds and/or cargo at their expenses and time.

If the crew by instruction from local authorities or fumigation company is to leave the vessel either at loading or discharging port(s) by reason of fumigation, any expenses incurred therefrom including transportation of crew, meals and lodging ashore and all time lost due to fumigation to be for Charterers' account and vessel to remain on full hire.

## CLAUSE 58 - DERATIZATION

Owners to provide valid deratization or deratization exemption certificate. The cost of renewal of deratization certificate if any, shall be for Owners' account.

## RIDER CLAUSE TO M/V "PACIFIC YUANGENG" CHARTER PARTY DATED 09TH MAY, 2008

## CLAUSE 59 - VESSEL ITINERARY

Charterers undertake to inform the Owners, during the period of this Charter, as regards to the itinerary of the vessel and the names and full styles of their agents at ports of call whenever so required by the Owners.

## CLAUSE 60 - P & I

Owners warrant that throughout the currency of this charter the vessel is and will remain insured with a P&I club.

Owners PNI Club : to be advised.

## CLAUSE 61 - ARBITRATION CLAUSE

Arbitration

Any dispute arising out of or in connection with this Charter Party, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The arbitration agreement contained in or evidenced by this clause and the arbitration shall both be governed by Singapore law. The Tribunal shall consist of one (1) arbitrator(s) to be appointed by the Chairman of the SIAC. The language of the arbitration shall be English.

Governing Law of the Charter Party

This Charter Party shall be governed by and construed in accordance with English law.

GA/Arbitration in Singapore, English law to apply.

## CLAUSE 62 - PERFORMANCE CLAIMS CLAUSE

Any claims by Charterers relating to the performance of the vessel and/or the vessel's equipment including speed claims are to be submitted to Owners in the form of a statement of claim with supporting documents within 10 days of the completion of the voyage concerned.

Any claims under this Charter Party should be proved with actual loss and damage.

## CLAUSE 63 - COFR

If the vessel calls U.S. ports, Owners guarantee the vessel will have a valid COFR.

## CLAUSE 64 - OVERAGE INSURANCE

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

*Overage insurance premium, if any, to be for Charterers' account.*

## CLAUSE 65 - EXTRA INSURANCE

Basic war risk insurance premium to be for Owners' account.

Any extra, additional or increased insurance premium charged by Owners' underwriters / brokers by reason of the areas traded under this Charter Party, whether for war risks, hull and machinery, P & I or blocking and   trapping cover, or for any other insurance policy whatsoever which the Owners take out, then the extra, additional or increased premium shall be for Charterers' account. Charterers also to pay crew war bonuses, if any, as per Owners' tariff if vessel trades to any country or area where such bonuses are applicable.

Charterers are to pay in full for such extra, additional or increased premium, and/or crew war bonuses, against receiving Owners or Owners' underwriters / brokers invoice by fax/email.

## CLAUSE 66 - INSURANCE PREMIUM BENEFIT

Charterers shall have the benefit of return insurance premium, if any, receivable by the Owners from the Underwriters by reason of the vessel being in port for a minimum of 30 (thirty) consecutive days, provided on full hire during the period for which insurance premium is refundable.

## CLAUSE 67 - CHANGE OF REGISTRY / FLAG / OWNERSHIP

Owners shall have the option to change the vessel's registry / flag or to sell the vessel with existing time charter, subject to Charterers' prior consent which is not to be unreasonably withheld.

## CLAUSE 68 - BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

## CLAUSE 69 - BIMCO STOWAWAYS CLAUSE FOR TIME CHARTERS

(a)(i) The Charterers warrant to exercise due care and diligence in preventing

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

## CLAUSE 70 - GENERAL AVERAGE

General average shall be adjusted, stated and settled according to York-Antwerp Rules 1994 or any subsequent modification thereof, in Singapore.

Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew.

## CLAUSE 71 - ITF

Owners warrant that during the period of this charter, the vessel's crew are employed under a bona fide union agreement the standards of which are acceptable to ITF or equivalent. In the event that vessel is actually delayed due to any labour related actions by Unions, Owners will take whatever action is necessary to remedy the situation immediately at Owners' time and cost.

## CLAUSE 72 - CERTIFICATES

## RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
## CHARTER PARTY DATED 09TH MAY, 2008

Owners warrant that the vessel shall throughout the currency of the Charter Party be in possession of valid classification and trading certificates or other documentation required to permit the vessel to trade worldwide.

## CLAUSE 73 - SUEZ CANAL TRANSIT

Subject to vessels of this size being permitted by the Canal authority to transit the Suez Canal, the vessel to be in possession of valid Suez Canal certificate and will so comply with the regulations and recommendations of the Suez Canal authority.

## CLAUSE 74 - EARLY CANCELLATION OF CHARTER DUE EXTENDED OFF-HIRE

If the vessel is placed off-hire for more than 60 (sixty) consecutive days in any period of 12 months due to any cause (except dry docking) other than Charterers' responsibility, Charterers shall have the option to cancel the balance period of this Charter.

## CLAUSE 75 - ICE CLAUSE

The Vessel shall not be obliged to force ice nor follow ice-breakers.

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers instructions.

Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.

Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area, shall be for the Charterers' account.

## CLAUSE 76 - LIEN CLAUSE FOR TIME CHARTERS

In addition to the right of lien conferred on the Owners according to the provisions of the charter-party lien clause, the Owners also to have a lien over bunkers on board, as well as over any sums due to Time Charterers under any sub-charterparties (in addition to freights and sub- freights), for any amounts due under this charter-party. Further, in the event of the Owners' exercise of their liberty to withdraw the vessel in accordance with the provisions of the charter-party withdrawal clause, the ownership of any

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

bunkers remaining on board shall thereupon vest in Owners, who shall allow to Time Charterers by way of credit against any sums due to Owners the value of such bunkers calculated in accordance with the provisions of the charter-party bunkers clause applicable on redelivery.

## CLAUSE 77 - TITLES

The titles to clauses and sub-clauses of this Charter Party shall not in any way affect the interpretation thereof.

## CLAUSE 78 - PRIVATE AND CONFIDENTIAL

All negotiations and eventual fixture are to be kept strictly private and confidential.

## CLAUSE 79 - CLAUSES TO BE INCORPORATED IN THIS CHARTER PARTY

-Bimco ISPS / MTSA Clause for Time Charter Parties 2005

-Bimco Bunker Quality Control Clause for Time Chartering

-Bimco Fuel Sulphur Content Clause for Time Charter Parties 2005

-U.S.Customs Advance Notification / AMS Clause for Time Charter Parties

- U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

## CLAUSE 80 - PROTECTIVE CLAUSES

New Jason Clause, Both-to Blame Collision Clause, General Clause Paramount or USA Clause Paramount or Canadian Clause Paramount whichever is applicable, are deemed to form part of this Charter Party and to be included in Bills of Lading issued under this Charter Party. Bimco War Risks Clause for Time Charters 2004 (CONWARTIME 2004) as attached is deemed to be incorporated in this Charter Party and to apply.

## CLAUSE 81

Should the vessel be placed off-hire during the currency of this Charter, Charterers have the option of adding all of any part of off-hire period, to the original period by giving notice to the Owners at least 90 (ninety) days before the expiration of the original period.

### New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery.

## Both-to-Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

## General Paramount Clause

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals."

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

## War Risks Clause for Time Charters, 2004
## (Code Name: CONWARTIME 2004)

(a)  For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)(i)  The Owners may effect war risks insurance in respect of the Hull and  Machinery of the Vessel and their other interests (including, but not  limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

## RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
## CHARTER PARTY DATED 09TH MAY, 2008

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-

(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)  to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)  to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h)  If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## BIMCO ISPS / MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).
(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## BIMCO BUNKER QUALITY CONTROL CLAUSE FOR TIME CHARTERING

## RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
## CHARTER PARTY DATED 09TH MAY, 2008

(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

## BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

RIDER CLAUSE TO M/V "PACIFIC YUANGENG"
CHARTER PARTY DATED 09TH MAY, 2008

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## US CUSTOMS ADVANCE NOTIFICATION /
## AMS CLAUSE FOR TIME CHARTER PARTIES

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and

Rider Clause to M/V "Pacific Yuangeng"
Charter Party Dated 09th May, 2008

for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

OWNERS                         CHARTERERS

# EXHIBIT 3

| Showing values for 31 October 2008 | | | |
|---|---|---|---|
| Code | Baltic Indices | Value | Movement |
| BDI | Baltic Exchange Dry Index | 851 | DOWN 34 |
| BCI | Baltic Exchange Capesize Index | 1265 | DOWN 42 |
| BPI | Baltic Exchange Panamax Index | 677 | DOWN 20 |
| BSI | Baltic Exchange Supramax Index | 583 | DOWN 34 |
| BHSI | Baltic Exchange Handysize Index | 329 | DOWN 17 |
| BDTI | Baltic Exchange Dirty Tanker Index | 1298 | DOWN 14 |
| BCTI | Baltic Exchange Clean Tanker Index | 1063 | DOWN 11 |



Index Summary

Copyright (c) 2011 Baltic Exchange Information Services Ltd

**BALTIC EXCHANGE CAPESIZE INDEX**

| Route No. | Description | Size mt | Weighting | Average in USD | Movement in USD | View |
|---|---|---|---|---|---|---|
| Baltic Exchange Capesize Index - 31 October 2008 - 265 DOWN 42 | | | | | | |
| BCI | | | | | | ☑ |
| C2 | 160000lt Tubarao -Rotterdam<br><br>**Full Route Description - C2**<br><br>Tubarao/Rotterdam 160,000 long tons 10 per cent iron ore free in and out, 6 days Sundays holidays included, 6 hours turn time at loading port and 6 hours turn time at discharge port 0.5% in lieu of weighing. Laydays 20 days forward from date of index, cancelling maximum 35 days forward from date of index. Vessel ⊞ age max. 18 years. Freight based on long tons. 3.75 per cent total commission. Nominal Weighting =10% | 160,000 | 10% | 6.059 | -0.209 | ☐ |
| C3 | 160000mt Tubarao - Qingdao<br><br>**Full Route Description - C3**<br><br>Tubarao/Qingdao 160,000 mt 10 per cent iron ore free in and out, 18m salt water arrival draft, scale load/30,000 mt Sundays holidays included discharge. 6 hours turn time at loading port, 24 hours at discharge port. Laydays 20 days forward from date of index, cancelling maximum 35 days forward from date of index. Vessel ⊞ age max. 18 years. Freight based on metric tonnes. 3.75 per cent | 160,000 | 15% | 10.642 | -0.354 | ☐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| | total commission. Nominal Weighting =15% | | | | | |
| C4 | **150000mt Richards Bay - Rotterdam**<br><br>**Full Route Description - C4**<br><br>Richards Bay/Rotterdam, 150,000 mt 10 per cent coal free in and out and trimmed, scale load/25,000 mt Sundays holidays included discharge. 18 hours turn time at loading port and 12 hours at discharge port. Laydays 25 days forward from date of index, cancelling 40 days forward from date of index. Vessel age max. 15 years. Freight based on metric tonnes. 3.75 per cent total commission. Nominal Weighting =5%. | 150,000 | 5% | 7.891 | -0.109 | ⌐ |
| C5 | **160000mt W Australia - Qingdao**<br><br>**Full Route Description - C5**<br><br>W Australia/Qingdao. 160,000 mt 10 per cent iron ore free in and out. 18m salt water arrival draft, scale load/30,000 Sundays holidays included discharge, 6 hours turn time at loading port and 24 hours at discharge port. Laydays 20 days forward from date of index, cancelling max 35 days forward from date of index. Vessel age max. 18 years. Freight based on metric tonnes. 3.75 per cent total commission. Nominal Weighting =15% | 160,000 | 15% | 4.914 | -0.063 | ⌐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| C7 | 150000mt Bolivar - Rotterdam<br><br>**Full Route Description - C7**<br><br>Bolivar/Rotterdam 150,000 mt 10 pct coal free in and out trimmed, 50,000 mt Sundays holidays included loading/25,000 mt Sundays holidays included discharge, 12 hours turn time at loading port and 12 hours turn time at discharge port. Laydays 20 days forward from date of index, cancelling maximum 35 days forward from date of index. Vessel El. age maximum 15 years. 3.75 per cent total commission. Nominal Weighting =5% | 150,000 | 5% | 6.323 | -0.282 | ☐ |
| C8_03 | 172000mt Gibraltar/Hamburg trans Atlantic RV<br><br>**Full Route Description - C8_03**<br><br>Delivery Gibraltar-Hamburg range, 5-15 days ahead of the index date, trans Atlantic round voyage duration 30-45 days, redelivery Gibraltar-Hamburg range, 3.75 per cent total commission. Based on a Baltic capesize of the following specifications: 172,000 mt dwt, not over 10 years of age, 190,000 cbm grain, max loa 289m, max beam 45 mtrs, draft 17.75 mtrs, 14.5 knots laden, 15.0 knots ballast on 56 mts fuel oil, no diesel at sea. Nominal Weighting =10% | 172000 | 10% | 4618 | -327 | ☐ |
| C9_03 | 172000mt Continent/Mediterranean trip | 172000 | 5% | 10888 | -627 | ☐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Far East | | | | | |
| | Full Route Description – C9_03 | | | | | |
| | Delivery Amsterdam-Rotterdam-Antwerp range or passing Passero, 5-15 days ahead of the index date, redelivery China-Japan range, duration about 65 days, 3.75 per cent total commission. Based on a Baltic capesize of the following specifications: 172,000 mt dwt, not over 10 years of age, 190,000 cbm grain, max loa 289m, max beam 45 mtrs, draft 17.75 mtrs, 14.5 knots laden, 15.0 knots ballast on 56 mts fuel oil, no diesel at sea. Nominal Weighting =5% | | | | | |
| | 172000mt Pacific RV | | | | | |
| | Full Route Description – C10_03 | | | | | |
| C10_03 | Delivery China-Japan range, 5-15 days ahead of the index date, round voyage duration 30-40 days, redelivery China-Japan range, 3.75 per cent total commission. Based on a Baltic capesize of the following specifications: 172,000 mt dwt, not over 10 years of age, 190,000 cbm grain, max loa 289m, max beam 45 mtrs, draft 17.75 mtrs, 14.5 knots laden, 15.0 knots ballast on 56 mts fuel oil, no diesel at sea. Nominal Weighting =20% | 172000 | 20% | 4058 | -323 | Γ |

| | | | | | | |
|---|---|---|---|---|---|---|
| C11_03 | 172000mt China/Japan trip Mediterranean/Cont<br><br>**Full Route Description - C11_03**<br><br>Delivery China-Japan range, 5-15 days ahead of the index date, redelivery Amsterdam-Rotterdam-Antwerp range or passing Passero, duration about 65 days. 3.75 per cent total commission. Based on a Baltic capesize of the following specifications: 172,000 mt dwt, not over 10 years of age, 190,000 cbm grain, max loa 289m, max beam 45 mtrs, draft 17.75 mtrs, 14.5 knots laden, 15.0 knots ballast on 56 mts fuel oil, no diesel at sea. Nominal Weighting =5% | 172000 | 15% | 4363 | -254 | ⌐ |
| C1 | 120000mt Hamp Roads - Rotterdam<br><br>**Full Route Description - C1**<br><br>Not reported since 31/03/2004. 1 port Hampton Roads excluding Baltimore/Rotterdam 120,000 metric tonnes 10 per cent coal free in and out and trimmed, 6 days shinc, 12 hours turn time at loading port and 12 hours turn time at discharge port. Laydays 10 days forward from date of index, cancelling maximum 30 days forward from date of index. Vessel's age max. 15 years. Freight based on metric tonnes 3.75 per cent total commission. | 120,000 | 0% | Not | Reported | ⌐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| C6 | 120000mt Newcastle - Rotterdam<br><br>**Full Route Description - C6**<br><br>Not reported since 31/03/2004. Newcastle/Rotterdam 120,000 mt 10 pct coal free in and out trimmed. 35,000 mt Sunday holidays included loading/25,000 mt Sundays holidays included discharge. 12 hours turn time at loading port and 12 hours turn time at discharge port. Laydays 25 days forward from date of index, cancelling maximum 40 days forward from date of index. Vessel's age maximum 15 years. 3.75 pct total commission. | 120,000 | 0% | Not | Reported | ☐ |
| C8 | Del. Gib - Hbg T/a r/v<br><br>**Full Route Description - C8**<br><br>Not reported since 24/12/2002. Delivery Gibraltar-Hamburg range, 5-15 days ahead of the index date, trans Atlantic round voyage duration 30-45 days redelivery Gibraltar-Hamburg range. 3.75 per cent total commission. Based on a Baltic Capesize of the following specifications -161,000 mt dwt not over 10 years of age, 176,000 cbm grain, max. loa 280m, max. beam 45m, 14 knots laden, 14.5 knots ballast on 52 mts fuel oil, no diesel at sea. | 161,000 | 0% | Not | Reported | ☐ |
| C9 | Del. Cont - Med Trip F/E | 161,000 | 0% | Not | Reported | ☐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Full Route Description - C9**<br><br>Not reported since 24/12/2002. Delivery ARA or passing Passero, 5-15 days ahead of the index date, redelivery China-Japan range, duration about 65 days, 3.75 per cent total commission. Based on a Baltic Capesize of the following specifications: 161,000 mt dwt, not over 10 years of age, 176,000 cbm grain, max. loa 280m, max. beam 45m, 14 knots laden, 14.5 knots ballast on 52 mts fuel oil, no diesel at sea | | | | | |
| C10 | Del. China - Japan F/E r/v<br><br>**Full Route Description - C10**<br><br>Not reported since 24/12/2002. Delivery China-Japan range, 5-15 days ahead of the index date, round voyage duration 30-40 days, redelivery China-Japan range, 3.75 per cent total commission. Based on a Baltic Capesize of the following specifications 161,000 mt dwt, not over 10 years of age, 176,000 cbm grain, max. loa 280m, max. beam 45m, 14 knots laden, 14.5 knots ballast on 52 mts fuel oil, no diesel at sea | 161,000 | 0% | Not | Reported. | ⌐ |
| C11 | Del. China - Japan trip Cont - Med<br><br>**Full Route Description - C11**<br><br>Not reported since 24/12/2002. Delivery China-Japan range. | 161,000 | 0% | Not | Reported | ⌐ |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 5-15 days ahead of the index date, redelivery ARA or passing Passero, duration about 65 days, 3.75 per cent total commission. Based on a Baltic Capesize of the following specifications: 161,000 mt dwt, not over 10 years of age, 176,000 cbm grain, max loa 280m, max beam 45m, 14 knots laden, 14.5 knots ballast on 52 mts fuel oil, no diesel at sea. | | | | | | |
| C12 | 150000mt Gladstone - Rotterdam<br><br>**Full Route Description - C12**<br><br>Not reported since 01/06/2010 Gladstone/Rotterdam 150000 mt, 10 per cent coal free in and out and trimmed, 17m load draft, 45000 Sundays holidays included load/25000 Sundays holidays included discharge, 12 hour turn time bends. Laydays 25 days forward from date of index, cancelling max 40 days forward from date of index. Vessel LL age max 15 years. Freight based on metric tonnes. 3.75 per cent total commission. | 150,000 | 0% | 12.440 | -0.290 | |

**Time Charter Average - 31 October 2008: $5982 (DOWN $383)**

**BALTIC EXCHANGE DAILY FIXTURE/INDEX LIST 31/10/2008**

**BDI 851 (DOWN 34) BCI 1265 (DOWN 42) BPI 677 (DOWN 20)**
**BSI 583 (DOWN 34) BHSI 329 (DOWN 17)**
**Last published BDTI 1312 (DOWN 16) BCTI 1074 (DOWN 17)**

**TIMECHARTER**

'Loch Lomond' 2002 75845 dwt   dely Canakkale 3/7 Nov   trip via Black Sea
redel Spain $6000 daily - Bunge

'Nordems' 2001 75259 dwt   dely Paranagua spot   trip redel Continent $6000
daily + $60000 bb - Armada

'Nord Orion' 2006 75250 dwt   dely N.China spot   trip via NoPac redel Far East
$5000 daily - Chinese chrtr

'Angelic Peace' 2001 74750 dwt   dely aps S.China 20/25 Nov   trip redel
Continent $4000 daily - Intermare

'Garima Prem' 2007 74456 dwt   dely Sepetiba 15/20 Nov 2 laden legs redel
Skaw-Cape Passero $9000 daily + $130000 bb - Azure

'Hellenic Wind' 1997 73981 dwt   dely Richards Bay ppt 3/5 months trading
redel worldwide $11500 daily - Swiss Marine - <fixed 27/10>

'Carola' 1997 73790 dwt   dely Kosichang spot 10/14 months trading redel
worldwide $13750 daily - Cargill - <recent>

'Rodon' 1993 73670 dwt   dely PMO 5/19 Nov   trip via Richards Bay redel
Lazaro Cardenas $4000 daily - Oldendorff

'Oriental Sun' 1998 72600 dwt   dely El Ferrol 5/10 Nov   trip via US Gulf redel
China $10200 daily - Alfred C.Toepfer

'Iguana' 1996 70349 dwt   dely Point Lisas ppt   trip via Houston & Saudi
Arabia redel Aden $11000 daily + $250000 bb - Louis Dreyfus

'Swift Fame' 1982 66919 dwt   dely aps Goa ely Nov   trip redel China $2500
daily - cnr

'GO Faith' 1984 65125 dwt   dely Cape Passero spot   trip via US Gulf redel
China $6000 daily - Raffles

**COAL**

'TBN' 70000/10 Roberts Bank/Guangzhou 21/30 Nov $10.00 fio
25000sc/20000sc - Peabody

**GRAIN**

'Glory Wealth TBN' 60000/5 hss N.France/Egyptian Med 1/5 Nov $10.25 fio 10000sx/8000sx - Venus

**MISC**


'Daeyang TBN' 70000/10 mop Ventspils/China 4/8 Nov $20.00 fio 9000sc/scale - cnr


Baltic Telephone 020 7369 1637 Fax 020 7369 1679. These reported fixtures are obtained from market sources.   Baltic members with an interest in a specific fixture should contact the owner/charterer involved to verify the report and its details. The Baltic Exchange cannot accept any responsibility for omissions and/or errors. ?The Baltic Exchange Ltd 2008. All copyright and intellectual property rights in this material and information are owned by The Baltic Exchange Limited. Any form of copying or distribution of the information contained by any means whether electronic or otherwise is expressly prohibited including distribution by e-mail or reproducing on a website. Persons wishing to copy or distribute information must obtain a licence from The Baltic Exchange Limited.


---

(c) Baltic Exchange Information Services Ltd 2011.
Telephone 020 7369 1637    Fax 020 7623 3645

These reported fixtures are obtained from market sources.
Baltic members with an interest in a specific fixture should contact the owner/charterer involved to verify the report and its details. Baltic Exchange Information Services Ltd cannot accept any responsibility for omissions and/or errors.
All copyright and intellectual property rights in all material and information on this document is owned by Baltic Exchange Information Services Ltd. Any form of copying or distribution of the information contained in this document by any means whether electronic or otherwise is expressly prohibited including distribution by e-mail or reproducing on a website. Persons wishing to copy or

distribute information must obtain a licence from Baltic Exchange Information Services Ltd..